IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. LKG-23-125 |
| | * | |
| KEVIN LEE SIMON, JR. | * | |
| | * | |
| Defendant | * | |
| | * | |
| ******* | | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

The Government hereby submits this memorandum in response to the Defendant's Sentencing Memorandum to aid the Court in Mr. Simon's sentencing hearing, scheduled for May 29, 2025, at 10:30 a.m. The Defendant pleaded guilty to a three-count superseding information charging him with conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(B), possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), and felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1). (ECF no. 113.)

The Government respectfully submits that a sentence of 168 months' imprisonment on each count, to run concurrently, is the appropriate term of imprisonment in this matter consistent with 18 U.S.C. § 3553(a). The Government further recommends 5 years of supervised release, a preliminary order of forfeiture of $322 in U.S. currency, and a $300 special assessment.

**FACTUAL BACKGROUND**

*Facts Regarding the Instant Offense, as Agreed to in the Plea Agreement's Statement of Facts:*

Between at least December 2022 and March 29, 2023, in the District of Maryland and elsewhere, the Defendant, **KEVIN LEE SIMON, JR.,** a/k/a "Delonte Lee Johnson" and "Sed," did knowingly combine, conspire, confederate, and agree with co-defendants **Bengi Bernard Knox** and **Malik Marvin Lloyd,** and others, to distribute and possess with the intent to distribute

1

phencyclidine, commonly known as PCP, a Schedule II controlled substance.

### **Lloyd** Supplies **Co-Conspirator 1** with PCP

On December 12, 2022, **Lloyd** received a phone call from **Co-Conspirator 1** seeking to be supplied with PCP. **Co-Conspirator 1** stated, "I heard, uh, everything back situated with y'all," and said that he would "holler at you probably, like, the next day." **Lloyd** responded, "I got you, fool." On December 19, 2022, **Co-Conspirator 1** called **Lloyd** asking, "Everything is still situated, right? and "Are you gonna put me a breath fire together?" As used here, "breath fire" referred to PCP. **Lloyd** agreed to deliver the PCP to the Palmer Park neighborhood of Prince George's County, Maryland. At approximately 7:09 p.m., law enforcement observed **Lloyd**'s vehicle approach a location in Palmer Park previously identified by law enforcement to be **Co-Conspirator 1**'s stash location, and observed **Lloyd** exit his vehicle and get into **Co-Conspirator 1**'s vehicle, where **Lloyd** stayed for a few minutes.

### **Lloyd** Is Supplied PCP by **Knox**

On January 5, 2023, **Lloyd** called **Knox** and asked whether **Knox** was available for a re-supply. **Lloyd** asked if **Knox** had "something with you." **Knox** asked if **Lloyd** was referring to "like the same shit," and **Lloyd** responded "yeah." At approximately 6:37 p.m., law enforcement observed **Knox**'s car park behind **Lloyd**'s vehicle at a location in Washington, D.C. **Lloyd** entered **Knox**'s vehicle and stayed for a few minutes. **Lloyd** then exited **Knox**'s vehicle and was observed by law enforcement to be carrying in his right hand a vial of PCP.

The following day, on January 6, 2023, **Lloyd** and **Knox** met to exchange money. **Lloyd** called **Knox** and told **Knox**, "You ain't come get your money." **Lloyd** advised he was on Clay Street in Northeast Washington, D.C., and **Knox** stated that he would be right there.

### **SIMON** and **Lloyd** Agree to Purchase PCP from a New Source of Supply

On February 13, 2023, **SIMON** and **Lloyd** spoke by phone. **Lloyd** told **SIMON** that **Lloyd** was about "to come and see you," and **SIMON** acknowledged the meet. **SIMON** and **Lloyd** proceeded to discuss the quality of their recent product, and of a potential new source of supply with higher quality product. **SIMON** told **Lloyd** that **SIMON** had received "some shit . . . to test out," and that "[t]his shit gold" and it was "crunch," meaning that it was high quality product. **SIMON** and **Lloyd** discussed some previous deliveries they had received and how the product quality was, in **SIMON**'s words, merely "alright." **SIMON** recalled buying a gallon, or 128 ounces, and giving **Lloyd** 32 ounces from it, stating, "all I bought, all I bought was a jug. And I gave you a 32 off the shit." A "jug" is a street term for one gallon. Thirty-two ounces is a quarter of a gallon, or 907.185 grams. **SIMON** told **Lloyd** that he is interested in buying "like a jug and a half" from the new source of supply, and **Lloyd** agreed to "bring a little bit."

### **SIMON** and **Knox** Agree to Purchase PCP from the New Source of Supply

On February 7, 2023, **SIMON** told **Knox** about the new source of supply. In a call, **SIMON** relayed to **Knox** that the new source of supply said the product was "super crunch."

**SIMON** proceeded to tell **Knox** that the source would sell **SIMON** the drug unaltered for $13,500, instead of $12,500 for the drug with some cutting agent:

> [H]e, at least he kept it real, he like he gonna put a little bit on it, that uh, if he was uh, give it to me for that number, he's like but, to give it to me straight up he got, he might got go 13-5, instead of 12-5, I'm like if that's your raw deal, then, then I can do that! Only thing is I'm not gonna be able to hit it and sell it to [a buyer] and them.

The quoted prices, $12,500 or $13,500 were for a gallon, or 128 ounces, of PCP. One gallon is approximately 3,628.74 grams. On February 13, 2023, **Knox** called an associate to ask to borrow money so that **Knox** could, with **SIMON**, make a purchase from **SIMON**'s new source of supply. **Knox** told his associate that **Knox** was "[t]rying to get the Sed [**SIMON**] thing and shit," that he was "waiting for Sed [**SIMON**] to call me back," and that **Knox** was "11 short," or $1,100 short. **Knox** and that associate met later that day.

On March 22, 2023, **Knox** complained about the quality of the product that he and **SIMON** received, stating, "But the problem is, the shit that Sed [**SIMON**] got me tied up in, that shit fucked me up. That's like thirteen grand. I'm tired of that bullshit ass water. That shit's fucked up." Water is also a street term for PCP. **Knox** continued, "And we just sitting on this shit. You can't…I can't give it to nobody."

March 29, 2023 Search and Seizure

On March 29, 2023, law enforcement executed a search warrant at **SIMON**'s residence in Washington, D.C. Law enforcement recovered 2,057.479 grams of a mixture or substance containing a detectable amount of PCP; 3.535 grams of a mixture or substance containing a detectable amount of cocaine base, a Schedule II controlled substance; and 0.629 grams of a mixture or substance containing a detectable amount of fentanyl. On March 29, 2023, **SIMON** knowingly possessed with the intent to distribute the PCP and cocaine base.

In total, as part of this conspiracy, 6,593.404 grams of a mixture or substance containing a detectable amount of PCP was reasonably foreseeable to **SIMON**, for a Converted Drug Weight for the PCP alone of 6,593.404 kilograms. In addition, **SIMON** possessed 3.535 grams of a mixture or substance containing a detectable amount of cocaine base, and 0.629 grams of a mixture or substance containing a detectable amount of fentanyl. The Converted Drug Weight of all three substances is 6,607.59 kilograms.

Law enforcement also recovered from **SIMON**'s residence two firearms, ammunition, a drum magazine, and U.S. currency; specifically:

- a black Taurus Model PT111 G2A handgun, bearing serial number TLN12380;
- a loaded 9mm magazine contained therein, containing approximately 16 rounds of assorted 9mm ammunition;
- a black ABC Rifle Company Model ABC-15 rifle, bearing serial number 77-5988;

- two loaded magazines contained therein, containing approximately 50 rounds of Lake City .223 ammunition;
- a box containing approximately 28 rounds of Magtech 9mm ammunition;
- one black drum magazine;
- one round of Lake City .223 ammunition; and
- $322.00 in U.S. Currency.

The black ABC Rifle Company Model ABC-15 rifle bearing serial number 77-5988 is a semiautomatic firearm that had attached to it a magazine that could accept more than 15 rounds of ammunition. The (1) black Taurus Model PT111 G2A handgun bearing serial number TLN12380, (2) 16 rounds of assorted 9mm ammunition, (3) black ABC Rifle Company Model ABC-15 rifle bearing serial number 77-5988, (4) 50 rounds of Lake City .223 ammunition, (5) 28 rounds of Magtech 9mm ammunition, and (6) one round of Lake City .223 ammunition (the "Firearms and Ammunition") were all manufactured outside of Maryland and the District of Columbia and therefore traveled in interstate and/or foreign commerce prior to being possessed by **SIMON** and recovered from **SIMON**'s residence on March 29, 2023.

Prior to possessing the firearms and ammunition on March 29, 2023, **SIMON** had, and knew that he had, been convicted of a crime punishable by imprisonment for a term exceeding one year, and his civil rights had not been restored.

## ARGUMENT

The Government submits that a sentence of 168 months concurrent is the appropriate term of imprisonment for the Defendant, to be followed by 5 years of supervised release.

**I.     The Presentence Investigation Report (PSR) Accurately sets forth the Applicable Guidelines Range**

*Total Offense Level:*  The total offense level is 33. PSR ¶ 37.

*Criminal History Category:*  The Government agrees with Probation that the Defendant's Criminal History Category is III. *Id*. at ¶ 52.

*Guidelines Range:*  The applicable guidelines range is 168-210 months' imprisonment. *Id.* at ¶ 98.

**II.    A 168-month Sentence is Sufficient, but not Greater than Necessary, to Achieve the Goals of Sentencing**

The Government submits that, considering the factors listed in 18 U.S.C. § 3553(a), a 168-

month term of imprisonment, to be followed by five years of supervised release, is a sufficient—but not greater than necessary—sentence for the Defendant.

A sentencing court must follow the three-step process set forth by *Gall v. United States*. *See* 522 U.S. 38 (2007). First, the court must properly determine the Guideline range. *See id.* at 49 (citing *Rita v. United States*, 551 U.S. 338, 347-48 (2007)). Second, the court must determine whether to apply any of the guidelines' departure policy statements to adjust the Guideline range. *See id.* at 49-50. Third, the court must consider all the factors set forth in 18 U.S.C. § 3553(a) as a whole, including whether a variance—a sentence outside the advisory guideline system—is warranted. *See id*.

The statutory factors for the court's consideration under 18 U.S.C. § 3553(a) include: 1) the nature and circumstances of the offense and history and characteristics of the defendant; 2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public and provide the defendant with needed services; and 3) the kinds of sentences available and the need to avoid unwarranted sentencing disparities. "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; *see also* 18 U.S.C. § 3661. "If the district court decides to impose a sentence outside the guidelines range, it must ensure that its justification supports 'the degree of the variance.'" *United States v. Evans,* 526 F.3d 155, 161 (4th Cir.), *cert. denied,* 555 U.S. 977, 129 S.Ct. 476, 172 L.Ed.2d 341 (2008) (quoting *Gall,* 552 U.S. at 51).

Applying this framework, taking into account the totality of the § 3553(a) factors, a 168-month sentence of imprisonment is sufficient, but not greater than necessary, for Mr. Simon. The

nature and circumstances of Mr. Simon's offenses are set forth in the stipulation of facts above. Mr. Simon dealt poison for profit to individuals struggling with addiction, causing ripple effects across northeast Washington, D.C. and nearby communities in Maryland. In March 2025 the Drug and Chemical Evaluation Section of the Drug Enforcement Administration (DEA) released an information page describing Phencyclidine, a Schedule II controlled substance. *See* https://www.deadiversion.usdoj.gov/drug_chem_info/pcp.pdf. It describes the effects of chronic abuse of PCP, which include impaired memory and thinking, persistent speech difficulties, suicidal thoughts, anxiety, depression, and social withdrawal. *Id*. Perhaps more frightening for family members and the general public, including police, is that PCP intoxication may last 4-8 hours, and even low to moderate doses "may induce feelings of detachment from the surroundings and oneself, numbness, slurred speech, and loss of coordination that is accompanied by *a sense of strength and invulnerability*. *Id*. (emphasis added.) Mr. Simon knows the effects of PCP—as he notes in the PSR, for 20 years he has avoided using the same product he sells to those who do not have his self-restraint. *See* PSR at ¶ 86.

Mr. Simon kept PCP, crack cocaine, fentanyl, and, despite being a convicted felon, *two* firearms in his residence. While the Defendant's sentencing memorandum correctly points out that Mr. Simon did not discuss his firearms on his cell phone for the 28 days from March 4, 2023 to April 1, 2023 that all of his communications on that cell phone were subject to court-authorized interception, and that during the times law enforcement conducted surveillance on Mr. Simon, he was not observed using his firearms, whether to threaten, harm his customers or others, or otherwise—the fact remains that Mr. Simon, knowing that he was prohibited from possessing a firearm or ammunition, kept firearms including a drum magazine, and dealt PCP and crack cocaine. The nature and circumstances of Mr. Simon's offenses are serious and have serious

consequences for the communities he frequented in Maryland and Washington D.C. that struggle with all the consequences of addiction and drug trafficking.

The Government's recommendation, at the bottom of the applicable guidelines range, accounts for the history and characteristics of the Defendant. Mr. Simon committed these offenses at the age of 40, nearly 27 years after his first contact with the justice system. His lengthy arrest and conviction record demonstrates a repeated failure to take advantages of short terms of imprisonment and supervised release efforts to address substance abuse and rehabilitation. *See* PSR at ¶¶ 87-88. As noted in the Defendant's memorandum, Mr. Simon's conduct has now trended in the wrong direction—the convictions in this matter are more serious than the ones he committed in his 20s and 30s. His history and characteristics do not support the substantial downward variance he requests.

Additional factors under 3553(a) support the Government's recommendation. The offenses set forth in the stipulation of facts are serious, demanding a significant sentence that would promote respect for the law. The offenses require a sentence that provides just punishment for the harms associated with the PCP and crack cocaine trades, particularly when the drug dealer is a felon who keeps firearms. While Mr. Simon may be capable of being a contributing member of a neighborhood, at 40 years old he was sustaining himself with proceeds from PCP and crack cocaine sales in neighborhoods where he did not reside, reinforcing cycles of addiction and potential violence by dealing PCP that he had quit for his own self-preservation decades earlier. While the government's recommended sentence would deter the Defendant and others from repeating the Defendant's criminal conduct, the need for the sentence to protect the public is significant in light

of the nature of the offenses and the Defendant's lengthy criminal history.

## **CONCLUSION**

For the reasons stated, as well as those presented at the sentencing hearing, the government submits that a sentence of 168 months' imprisonment, to be followed by five years of supervised release, and a $300 special assessment is an appropriate disposition of this matter.

Respectfully Submitted,

KELLY O. HAYES
United States Attorney

By:  /s/ Timothy F. Hagan, Jr.
Timothy F. Hagan, Jr.
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

This is to certify that on this day, **May 22, 2025**, a copy of the foregoing Government's Sentencing Memorandum was electronically filed and delivered via ECF to all counsel of record in this matter.

 /s/ Timothy F. Hagan, Jr.
Timothy F. Hagan, Jr.
Assistant United States Attorney